AES/DCP:MEB/AS
F. #2019R01465

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA | I N F O R M A T I O N |
| - against – | Cr. No. 20-377 (ENV)<br>(T. 18, U.S.C., §§ 371, 981(a)(1)(C) and |
| ENRIQUE PERE YCAZA, | 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c)) |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE UNITED STATES CHARGES:

At all times relevant to this Information, unless otherwise stated:

I.   The Defendant and Relevant Individuals and Entities

1.   The defendant ENRIQUE PERE YCAZA ("PERE") was a citizen of Ecuador and Spain. PERE provided consulting services, incorporated consulting businesses and opened bank accounts in the United States and elsewhere that were used to facilitate the payment of bribes to Ecuadorian officials. PERE was an agent of a "domestic concern" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(1).

2.   Antonio Pere Ycaza ("Antonio Pere") was a citizen of Ecuador, Spain and the United States who resided in Miami, Florida and the brother of the defendant ENRIQUE PERE YCAZA. Antonio Pere, along with PERE, exercised control over companies and bank accounts in the United States and elsewhere that were used to facilitate

2

the payment of bribes to Ecuadorian officials. Antonio Pere was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

3. Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned and state-controlled oil company of the Republic of Ecuador and performed a function that Ecuador treated as its own. Petroecuador was an "instrumentality" of the Ecuadorian government, as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

4. Trading Company #1, the identity of which is known to the United States, was a European energy trading company with subsidiaries around the world, including in the United States.

5. Trading Company #1 Employee, an individual whose identity is known to the United States, was a citizen of Canada and resided in the Bahamas. At various times during the relevant time period, Trading Company #1 Employee worked in Houston and in the Bahamas for Trading Company #1 as a manager, a crude oil trader, an agent and an independent contractor.

6. Trading Company #2, the identity of which is known to the United States, was the U.S. subsidiary of a European energy trading company with its principal place of business in Houston, Texas. Trading Company #2 was a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

7. Trading Company #2 Employee, an individual whose identity is known to the United States, was a citizen of Mexico and lawful permanent resident of the United

States.  At all relevant times, Trading Company #2 Employee worked in Houston, Texas for Trading Company #2 as a manager and oil trader.  Trading Company #2 Employee was a "domestic concern" and an employee of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

8. Asphalt Company, the identity of which is known to the United States, was an asphalt company incorporated and based in Florida.  Asphalt Company was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

9. Asphalt Trading, the identity of which is known to the United States, was a company incorporated in the Bahamas and based in the United States that was one of a group of companies related to Asphalt Company.  Asphalt Trading's principal place of business was in Florida.  Asphalt Trading was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

10. Asphalt Company Employee, an individual whose identity is known to the United States, was a citizen of Venezuela and legal permanent resident of the United States as of at least 2017.  Asphalt Company Employee worked at Asphalt Company in or about and between 2012 and 2018.  Asphalt Company Employee was an employee of a "domestic concern" and an agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

11. Asphalt Trading Employee, an individual whose identity is known to the United States, was a citizen of the United States who worked for Asphalt Trading and

other companies affiliated with Asphalt Company from approximately 2006 through 2018. Asphalt Trading Employee was a "domestic concern," an employee of a "domestic concern" and an agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

12.     Consulting Company #1 and Consulting Company #2, the identities of which are known to the United States, were companies formed by the defendant ENRIQUE PERE YCAZA and Antonio Pere in Panama and the British Virgin Islands, respectively. PERE, together with Antonio Pere and others, used Consulting Company #1 and Consulting Company #2 to pay and conceal bribe payments to Ecuadorian officials in order to obtain and retain business for Trading Company #1 and Asphalt Company.

13.     Consulting Company #3, the identity of which is known to the United States, was a company formed by the defendant ENRIQUE PERE YCAZA and Antonio Pere in the British Virgin Islands. PERE, together with Antonio Pere and others, used Consulting Company #3 to pay and conceal bribe payments to Ecuadorian officials in order to obtain and retain business for Trading Company #2.

14.     Ecuadorian Official #1, an individual whose identity is known to the United States, was a citizen of Ecuador and served as a senior manager at Petroecuador from approximately 2010 to May 2017. Ecuadorian Official #1 was a "foreign official," as that

term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

15. Ecuadorian Official #2, an individual whose identity is known to the United States, was a citizen of Ecuador and served as an Ecuadorian official from approximately 2018 to March 2020. Ecuadorian Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

16. Ecuadorian Official #3, an individual whose identity is known to the United States, was a citizen of Ecuador and served as a senior manager at Petroecuador since approximately 2017. Ecuadorian Official #3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

II. The Foreign Corrupt Practices Act

17. The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to corruptly offer, promise, authorize or pay money or anything of value, directly or indirectly, to a foreign government official for the purpose of obtaining or retaining business for, or directing business to, any person.

III. The Bribery and Money Laundering Schemes

18. From in or about and between June 2011 and July 2019, the defendant ENRIQUE PERE YCAZA, together with others, engaged in international bribery and money laundering schemes, in which he knowingly, willfully and corruptly offered and agreed to

6

pay bribes to and for the benefit of Ecuadorian officials, in order to obtain and retain business for companies, including Trading Company #1, Trading Company #2 and Asphalt Company. During the same time period, PERE, together with others, also agreed to knowingly conduct financial transactions designed to conceal and disguise proceeds of the illegal bribery schemes and with the intent to promote the illegal bribery schemes.

19. In furtherance of the bribery schemes, in or about and between June 2011 and July 2019, the defendant ENRIQUE PERE YCAZA and his co-conspirators agreed to make and did make bribe payments to Ecuadorian officials, including Ecuadorian Official #1, Ecuadorian Official #2 and Ecuadorian Official #3, for the purpose of corruptly obtaining and retaining contracts, by, among other things, securing an improper business advantage in connection with oil products and asphalt contracts awarded by Petroecuador, for Trading Company #1, Trading Company #2, Asphalt Company and others.

20. To promote the bribery schemes and conceal the proceeds derived from them, the defendant ENRIQUE PERE YCAZA and his co-conspirators established and used bank accounts located in numerous jurisdictions, including Panama, the Cayman Islands and the United States. Trading Company #1, Trading Company #2 and Asphalt Company caused payments to be made into those bank accounts, which were used, at least in part, to pay bribes into shell company bank accounts for the benefit of Ecuadorian Official #1, Ecuadorian Official #2 and Ecuadorian Official #3. PERE and his co-conspirators also

created and entered into corrupt consulting agreements to conceal and promote the bribery and money laundering schemes.

21. The defendant ENRIQUE PERE YCAZA and his co-conspirators took acts in furtherance of the bribery and money laundering schemes, including by communicating by email, telephone and in person while in the territory of the United States, and by sending wires and causing wires to be sent that passed through the Eastern District of New York.

22. From in or about and between January 2013 and 2019, Trading Company #1, Trading Company #2 and Asphalt Company made payments totaling more than $70 million to bank accounts controlled by the defendant ENRIQUE PERE YCAZA and Antonio Pere. PERE and Antonio Pere in turn made and caused to be made bribe payments totaling approximately $22 million to Ecuadorian officials and others on behalf of Trading Company #1, Trading Company #2 and Asphalt Company.

A. The Trading Company #1 Scheme

23. Beginning in or about June 2011, the defendant ENRIQUE PERE YCAZA agreed with Antonio Pere and others, including with Trading Company #1 Employee, to pay bribes to Ecuadorian officials in order to secure an improper advantage for Trading Company #1 in connection with potential contracts to purchase oil products that

8

Petroecuador might award to a state-owned entity in Asia ("State-Owned Entity #1"), the identity of which is known to the United States.

24.     Specifically, in or about June 2011, Trading Company #1 agreed with State-Owned Entity #1 to perform the work, assume the risk and keep the product purchased under any contract State-Owned Entity #1 entered into with Petroecuador to purchase oil products.

25.     In or about October 2012, to facilitate the payment of bribes and to conceal the bribery scheme, the defendant ENRIQUE PERE YCAZA executed a corrupt consulting agreement between Trading Company #1 and Consulting Company #1.  Pursuant to the agreement, Trading Company #1 agreed to pay Consulting Company #1 a commission per barrel of Ecuadorian oil products that Trading Company #1 purchased from Petroecuador under the contract between Petroecuador and State-Owned Entity #1.

26.     Thereafter, beginning in or about January 2013, pursuant to the corrupt consulting agreement, Trading Company #1 wired payments to Consulting Company #1 and later Consulting Company #2, part of which were passed on to Ecuadorian Official #1 by the defendant ENRIQUE PERE YCAZA and Antonio Pere in furtherance of the bribery scheme.

27.     In or about and between 2013 and July 2019, the defendant ENRIQUE PERE YCAZA and his co-conspirators, including Trading Company #1 Employee, continued the bribery scheme and made additional payments to Ecuadorian officials in

connection with similar agreements between Petroecuador and two other state-owned entities in Asia, the identities of which are known to the United States.

28.     In furtherance of the scheme, Trading Company #1 wired payments, some of which passed through the Eastern District of New York, to bank accounts in the Cayman Islands controlled by the defendant ENRIQUE PERE YCAZA and Antonio Pere, knowing that they would be used, at least in part, to pay bribes to Ecuadorian officials.  PERE and Antonio Pere then caused a portion of the payments to be wired to bank accounts in Panama and Portugal, and Antonio Pere caused a portion of the payments to be wired to a bank account in the United States, from a bank account in the Cayman Islands for the benefit of Ecuadorian Official #1.

29.     Beginning in or about 2015, the defendant ENRIQUE PERE YCAZA and Antonio Pere agreed to secretly pay Trading Company #1 Employee kickbacks from the funds paid by Trading Company #1 to Consulting Company #1, in addition to the bribes they were paying to Ecuadorian officials.

30.     In addition, beginning in or about 2017, with the knowledge of Trading Company #1 Employee and others, the defendant ENRIQUE PERE YCAZA and Antonio Pere also wired a portion of the payments they received from Trading Company #1 from a bank account in the Cayman Islands to bank accounts in Panama for the ultimate benefit of Ecuadorian Official #2 and Ecuadorian Official #3.

10

### B. The Trading Company #2 Scheme

31.     Beginning in or about 2015, the defendant ENRIQUE PERE YCAZA and Antonio Pere agreed with Trading Company #2 Employee to pay bribes to Ecuadorian officials, including Ecuadorian Official #1, to secure an improper advantage for Trading Company #2 in connection with potential contracts related to Petroecuador.

32.     In or about 2016, Trading Company #2 agreed with a state-owned entity located in the Middle East ("State-Owned Entity #2"), the identity of which is known to the United States, to perform the work, assume the risk and keep the product purchased under a contract for State-Owned Entity #2 to purchase fuel oil from Petroecuador.

33.     On or about December 22, 2016, to effectuate and conceal the bribery scheme, the defendant ENRIQUE PERE YCAZA and Antonio Pere, with the knowledge and involvement of Trading Company #2 Employee, devised a scheme in which payments for the bribery scheme would be sent to Consulting Company #3 from two shell companies registered in Curacao. To effectuate the payments, PERE and Antonio Pere executed sham consulting agreements between Consulting Company #3 and the shell companies in Curacao.

34.     Trading Company #2 thereafter caused the shell companies in Curacao to wire payments to a bank account of Consulting Company #3 in the Cayman Islands. After receiving those payments, with the knowledge of Trading Company #2 Employee, the defendant ENRIQUE PERE YCAZA and Antonio Pere wired a portion of the proceeds from

accounts under their control to bank accounts in Panama for the benefit of Ecuadorian officials, including Ecuadorian Official #1, in order to obtain and retain business for Trading Company #2.

      C.      <u>The Asphalt Company Scheme</u>

      35.      In or about June 2014, at a meeting in Miami, Florida, Antonio Pere, Asphalt Company Employee and Asphalt Trading Employee agreed that Antonio Pere would receive a commission if Petroecuador awarded Asphalt Company an asphalt supply contract in an upcoming tender process. They further agreed that Antonio Pere would seek Ecuadorian Official #1's assistance in securing the contract for Asphalt Company. The defendant ENRIQUE PERE YCAZA and Antonio Pere intended, and Asphalt Company Employee and Asphalt Trading Employee knew that there was a high probability, that Antonio Pere would make bribe payments to Ecuadorian Official #1 out of Antonio Pere's commission.

      36.      After the Petroecuador contract was awarded to Asphalt Company, the defendant ENRIQUE PERE YCAZA executed a corrupt consulting agreement between Consulting Company #1 and a Swiss affiliate of Asphalt Company to facilitate the bribery scheme and to conceal the bribe payments. Pursuant to that corrupt agreement, Asphalt Company paid Consulting Company #1 approximately $471,881 through its Swiss affiliate, knowing that there was a high probability that those funds would be used, at least in part, to pay bribes to benefit Ecuadorian Official #1.

12

## THE CONSPIRACY TO COMMIT MONEY LAUNDERING AND VIOLATE THE FCPA

37. The allegations contained in paragraphs one through 36 are realleged and incorporated as if fully set forth in this paragraph.

38. In or about and between June 2011 and July 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ENRIQUE PERE YCAZA, together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

(a) to knowingly transport, transmit and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of one or more specified unlawful activities, to wit: (i) felony violations of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3; and (ii) offenses against a foreign nation involving bribery of a public official, in violation of Articles 280 and 285 of the Ecuadorian Penal Code, contrary to Title 18, United States Code, Section 1956(a)(2)(A);

(b) to knowingly transport, transmit and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and

transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: (i) felony violations of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3; and (ii) offenses against a foreign nation involving bribery of a public official, in violation of Articles 280 and 285 of the Ecuadorian Penal Code, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i);

(c) being a domestic concern, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist PERE, Antonio Pere, Trading Company #2, Asphalt Company and others in obtaining and retaining business for and with, and directing

14

business to, PERE, Antonio Pere, Trading Company #1, Asphalt Company, Trading Company #2 and others, contrary to Title 15, United States Code, Section 78dd-2; and

(d) while in the territory of the United States, corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any act in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all or a portion of such money and thing of value would be offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist PERE, Trading Company #1, Consulting Company #1, Consulting Company #2, Consulting Company #3 and others in obtaining and retaining business for and with, and directing business to, PERE, Antonio Pere, Trading Company #1, Asphalt Company, Trading Company #2, Consulting Company #1, Consulting Company #2, Consulting Company #3 and others, contrary to Title 15, United States Code, Section 78dd-3.

39.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant ENRIQUE PERE YCAZA, together with others, committed and caused the commission of, among others, the following:

## OVERT ACTS

(a)     On or about November 20, 2014, Antonio Pere sent an invoice for approximately $188,752.85 to the Swiss affiliate of Asphalt Company pursuant to the corrupt consulting agreement with Consulting Company #1.

(b)     On or about November 28, 2014, Trading Company #1 caused a wire transfer of approximately $1,971,970.39 from a bank account in Singapore, through a correspondent account at a bank in New York, New York, into an account in Panama held by Consulting Company #1.

(c)     On or about June 2, 2016, Antonio Pere instructed PERE, while both were in the United States, to cause a wire transfer of approximately $228,500.00 from a bank account in the Cayman Islands held by Consulting Company #1, through a correspondent account at a bank in New York, New York, into an account in Panama held by a close relative of Ecuadorian Official #1.

(d)     In or about February 2018, in order to facilitate and conceal commission payments from Trading Company #2 to Consulting Company #3, PERE signed consulting contracts backdated to December 22, 2016 with two shell companies registered in Curacao.

(e) On or about November 7, 2018, Trading Company #2 caused a wire transfer of approximately €63,345.36 from a shell company bank account in Curacao to a bank account in the Cayman Islands held by Consulting Company #3.

(f) On or about and between February 11, 2019 and April 1, 2019, Trading Company #1 caused three wire transfers totaling more than $2.8 million from a bank account in Singapore, through a correspondent account at a bank in New York, New York, into an account in Panama held by Consulting Company #1.

(g) On or about April 4, 2019, Antonio Pere instructed PERE, while both were in the United States, to cause a wire transfer of approximately $2,200,088.95 from a bank account in the Cayman Islands in the name of Consulting Company #1 to a bank account in Portugal for the ultimate benefit of Ecuadorian Official #1.

(h) On or about June 27, 2019, Antonio Pere instructed PERE, while both were in the United States, to cause a wire transfer of approximately $142,927.00 from a bank account in the Cayman Islands held by Consulting Company #1, through a correspondent account at a bank in New York, New York, into a bank account in Panama for the ultimate benefit of Ecuadorian Official #2 and Ecuadorian Official #3.

(i) On or about July 22, 2019, Antonio Pere instructed PERE, while both were in the United States, to cause a wire transfer of approximately $175,100.00 from a bank account in the Cayman Islands held by Consulting Company #3, through a correspondent account at a bank in New York, New York, into a bank account in Panama, approximately

17

$100,000.00 of which was for the benefit of Ecuadorian Official #2 and Ecuadorian Official #3.

(j) On or about July 24, 2019, Trading Company #1 caused a wire transfer of $1,366,502.87 from a bank account in Singapore, through a correspondent account at a bank in New York, New York, into a bank account in the Cayman Islands held by Consulting Company #1.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

40. The United States gives notice to defendant that, upon his conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense, including but not limited to the sum of two million, three hundred ninety-five thousand, five hundred, ten dollars and zero cents ($2,395,510).

41. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

18

(e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

*/s/ Seth D. DuCharme*
SETH D. DuCHARME
Acting United States Attorney
Eastern District of New York


*/s/ Daniel S. Kahn*
DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice


*/s/ Deborah Connor*
DEBORAH CONNOR
Chief, Money Laundering and Asset Recovery Section
Criminal Division
U.S. Department of Justice